Good afternoon. May it please the Court, Lawrence Stone for Jackson-Lewis, P.C. on behalf of Petitioner, Rock-Tenn Services, Inc. and Smurfett Stone Container. You haven't settled, have you? We have not, Your Honor. I mean, the essential issue still exists, which is that the Board overturned the administrative law judge's award, where he granted – excuse me, he dismissed the complaint to the National Labor Relations Board. It's entirely immaterial. I'm sorry? Isn't it entirely immaterial that they overturned the ALJ opinion for our purposes? No, Your Honor, because what's really at stake here is the integrity of the collective bargaining process and the integrity of that process for the company. The Board completely ignored a 40-year bargaining history. That's a whole different question. But the fact that they overturned the ALJ is not a problem of ours. But the finding that there was a sufficient nexus between the four points of the party's closing agreement to constitute what really became a mandatory subject so that the company was bargaining essentially in good faith and, frankly, knows the route of their This is a contract that covered 12 different facilities. And the parties knew – Which contract? This particular – Oh, you mean the underlying contract, not this agreement. The underlying agreement covered 12 different facilities. I see. And over the years, and it really is based on that 40 years, where the facilities had gotten old, the businesses had changed, competition came in, economics set in, and the parties needed to have an idea, a framework, for being able to close facilities. And at the same time that they're – The framework, as I understand it, that you're talking about, is the provision in the San Jose Agreement, or it was the earlier Fresno Agreement, it was the earlier – it says severance pay. And ER-79, is that what we're talking about? Yes. Is that the framework? Okay. It says – the heading is severance pay, right? And it says the parties agree that the collective bargaining agreement will stay the way it is. It is the company's intent in future planned closures, if any, to bargain a severance impact bargaining agreement that is not inconsistent with severance impact bargaining at San Jose. So in earlier years, I don't understand – that's about severance pay. It doesn't say anything about termination of the agreement. And not only that, but in San Jose and Sequoia Pacific, as I understand it, the agreement terminated after the last employee left, and that wasn't your position. The – in the San Jose Agreement, though, it set out this structure for this – for this framework, the framework being the termination of the contract, the suspension of the contract. But that's what you're saying, but that's not in this memorandum of agreement. It says nothing about a termination of the contract. And the reason for that is because there were different facilities under this agreement. So each facility may have had different aspects that may have impacted the closing, the use of certain machines. In fact, in Fresno – All right, so then it's not a pattern. I mean, either it is a pattern or it isn't a pattern. That's right, except that the parties knew at the time. And following the San Jose closure, the parties entered into negotiations again in 2004 for these 12 contracts. The union had offered a particular severance pay formula. The company rejected that, and they rejected that, which the union agreed to. And they rejected that, though, in accordance with a structure that would not be inconsistent with the San Jose. But it is inconsistent because the San Jose proviso, as the board pointed out, was the termination of the CBA would occur only, only if the plant closed or after the last employee was laid off. And there was – that's – But, Your Honor, those were particular terms. Well, so what? That framework still existed. And it – It's very hard to understand what you're talking about. I mean, a framework that you don't follow isn't the framework that you're following. It's a different framework. But the four points still existed, terminating the contract in some fashion. No, but number one, you're just – you're sliding over that. The board made the point that it is until the last employee has left. You're saying, no, we can bargain it down to one and then we can hold it and then ask that the CBA be terminated entirely. Because the parties then were bargaining over the particular terms, how those would impact that particular closure. I've got a little reality, world reality question. I've been puzzling over why everybody cared about this so much, about this when and the fact that you were willing to scotch the whole deal in order to have it not cover one employee. And vice versa, the union was willing to scotch the whole deal to have it cover one employee. There must – there's an – is this about successorship? What is it about? What's really underlying this problem? It's a recall. It's about – well, it certainly is about recall. I mean, the company wanted to terminate the agreement because it wanted to extinguish those recall rights. What it's really about is the relationship. It's about the collective bargaining relationship. And because Sanhok – Whether it would carry over to a successor. I beg your pardon? And whether it would carry over to a successor. Well, not necessarily. In fact – Not necessarily, but possibly. Possibly. But an additional – but the union would have had organizing rights potentially if the successor, or obviously issues under the National Labor Relations Act would have applied. In fact, they subsequently opened another plant in Fresno. Again, new equipment and new product and new economics. And that's now currently organized. But they were very focused on doing a closing agreement that would meet the specific needs of the employees, but also of the company. Because it was very, very important. In fact, in Fresno, it became – it went from a production facility for a short time to a distribution facility. And all of these plants, you know, may have sort of relied on one another. I mean, in terms of their production and their distribution. And so that was very carefully laid out. And that's why, dating back a number of years, the company knew that it was going to be engaging in these closures, but it wanted to make sure that it had some flexibility with regard to the terms. In fact, even at the hearing, you know, the union conceded that the framework of the agreement would meet the status quo. Later on in negotiations for Fresno, they tried to – they suggested that they implement status quo. Kagan. Well, let me – I mean, aside from the factual problems with that formulation that we've been over, I mean, either you agree or disagree. But conceptually, I have a hard time with this notion that if you – that you're not eating up Borg Warner entirely, if you say that you can insist on a not – in the end, have a refused bargain about a nonmandatory subject, because it's a quid pro quo for a mandatory subject. I mean, that's what it always is. But that's the interesting part of this. Okay? The definition is a sufficient nexus. It doesn't say an only – Well, first of all, where are you getting that from? I mean, is there any actual court – I know there are four or five board cases, and they're really about a bunch of different things. Is there any court case? I'm sorry? Is there any court case? Not that we were able to find. We found the board case. Okay. So that's problem number one. No court has ever actually approved this whole idea. And it's not funny. I mean, it's true. And second – and I have a hard time quite understanding it. But secondly, if you go through each of the cases, it seems to me they're all about something. What's the closest-in case? I beg your pardon? What do you think is the closest-in of the board cases? Well, I think – I mean, honestly, I think in – if you look at Seabay Manor, which talked about interest arbitration. Well, that – in that case, they had already agreed to the interest arbitration. It wasn't about bargaining for interest arbitration. That's not what it was about. That's not what the opinion in the case was about.  If the board didn't agree, the board would not be able to bargain. If they had refused to bargain about interest arbitration, or if they insisted on bargaining any interest arbitration, every indication of that opinion is it would have been a problem. That's not what the opinion in the case was about. Right? Right. But it was about the voluntary agreement. I'm sorry? It was about the voluntary agreement. Yes. It was about the fact that once you have this agreement to settle terms and conditions by interest arbitration, if you don't do it, you therefore are not implementing the terms and conditions. It was in that sense that they were intertwined. It wasn't that it was a quid pro quo. It wasn't about a quid pro quo. But that's exactly the point, because the board said that because there had been this voluntary agreement, it's the kind of thing that's what I'm trying to get at. You say it's a voluntary agreement. You call your brief. I went through your brief, and I tried to understand. Maybe I'm being dense, but the fact that there are ongoing employees after the CBA is terminated means those employees who are still working are now not subject to what they had before, the CBA rights. Whereas in the San Jose structure, there was no employee under that framework, as I would understand what the union voluntarily agreed to bargain about. The framework had the caveat that you could not deprive ongoing employees, in this respect, of the protections and benefits of the CBA if they were ongoing employees. The San Jose framework did not include stripping out CBA protection from people who were still employed before the closure. So you're calling it a framework overall that you can bargain about terminating the clause, and you can explain why it isn't, of the protection of the ongoing workers who aren't terminated before the termination of the CBA. Now, it's clear, and the board said, you could back off. You could have modified your proposal then to reflect the idea that they wouldn't adhere to that part of it, but you just declared and, you know, it was over. But they did during the course of the negotiations. I mean, what we would submit is that the termination of the contract. They did what? They changed their proposal about the termination of the contract, that that was a term within this framework. Who changed it? The company did. They started at five employees. So it's still the same concept. They came down to one. And then we get back to Judge Brezan's question. What's the point? Well, because the union response at that point was they did not want the contract to terminate at all. They wanted it to remain in effect in an empty building with no employees. Maybe even the building would be gone until 2011. But you never said, okay, as soon as there are no new proposals, as soon as there are no employees, no employees, there won't be a collective bargaining agreement. You never said that. But during the course of the negotiations, the company did, in negotiating that term, get down to the one employee. Okay, fine. That was rejected. Right. The union asked the company to make a last, best, and final. The company made a last, best, and final. It wasn't zero, which was not zero. It was not zero. So it had one employee. Right. That's correct. And the only response from the union was that the contract would remain in force and effect, which is inconsistent also with what the union said at the hearing, which was that this was the status quo and that the San Jose agreement was zero. I mean, I also, to be honest with you, do not read this one sentence on ER-80 as committing the union to anything. So I don't see why it's an agreement. The first sentence says the parties agree. The next sentence says it's the company's intent in future plan closures to bargain severance impact formula that's not inconsistent. It doesn't commit the union to anything. In a bargaining sense. Well, it obligated the parties to talk about it. There. Again, well, because not inconsistent with the San Jose. But it is the company's intent. It doesn't commit the union to anything. But it was the San Jose agreement that formed the basis. That's what created. I understand. But you are trying to rely on this agreement as the parallel to the interest arbitration agreement in the other case, i.e., to an agreement to bargain, a voluntary agreement to bargain about a non-mandatory subject. Where is that voluntary agreement on the part of the union? Well, the voluntary agreement is that it would, it would, it existed in the collective bargaining agreement. It was an agreement between the parties to talk about now a closing structure. Look, the parties have an obligation, obviously, to bargain about the effects. But that could mean that it could be timing. It could be how people will be laid off. What the parties committed to was this structure of discussing. Where did the union commit to that? When the reference to the San Jose agreement. But then to negotiate those terms. I've read you the sentence. You're just not dealing with it. It doesn't say that the union, that sentence before says that the union agrees to something, but this sentence only says what the company's intent is. That was an agreement between the parties there. I mean, that was a settled. So you're saying they conceded the permissive argument because they agreed to allowing the company to intend to put on the table severance. It doesn't say anything about the early termination of the CBA, does it? It does not specifically. But that's when that framework became a mandatory subject. Okay. Did you want to talk about the remedy at all? But the Transmarine remedy is Your time is up. We'll give you a minute now and a minute later. That the impact existed when the plant finally closed in September of 2009. Are you arguing about the remedy substantively or only procedurally? I thought your complaint was, as far as I can tell, that it wasn't in the complaint. It was not in the complaint. Right. But are you also complaining about it substantively? Procedurally. Procedurally. And the parties did at some point enter into negotiations and resolve that issue anyway. Oh, you did? They did. So we don't have an issue? That really isn't an issue at this point. Can you tell that from meeting the briefs? Go ahead. Well, but this legal issue is still there so that the parties understand what their collective bargaining obligations are. I'm sorry. I don't understand what you're saying. The integrity of the bargaining process. But you're telling me that even this is so now we're back to our earlier conversation, that despite the fact that the briefs do argue about the remedy, there's no remedy issue before us? The – I think that's right, Your Honor. I'm glad you told us. All right. Thank you. Perhaps somebody would like to inform us about that. Thank you. May it please the Court. My name is Lee. You wanted to start with this last thing. Is it right that the remedy issue has been settled and we don't have a problem here? I don't know that the remedy issue has been settled. I understand that the parties entered an agreement to pay severance to employees, but that is also subject to the NLRB remedies contained in the board's order. Well, perhaps both of you can inform us about that, because I certainly thought we had a remedy issue. All right. Go ahead with Maris. Parties, as you know, cannot condition a bargaining agreement on a permissive subject of bargaining unless they can show that that permissive subject is so intertwined with a mandatory subject that it essentially becomes mandatory itself. You know, it's – the four or five board cases on this are really mysterious. I agree. They're about a set of different things that are not terribly tied together. And is it true that there's no court case? Well, there's Pleasantview Nursing Home. It's the only one I can think of. Sixth Circuit. Right. And in that case, the Court disagreed with the board and found that the company could insist on the tying together of union security and a collection clause, because they were so intertwined and because it continued the status quo. The Court also found that the company didn't bargain to impasse on that issue, so it wasn't insisting to deadlock, that there were negotiations still going on, but that it continued the status quo. For the parties bargaining for years, there had been no collection of the union – there had been a union security clause, but no collection of initiation fees under their practice. And that's certainly not the case here. The status quo, as you recognize, not only in the San Jose framework, but in the follow-up negotiations over Marquardt closing and the proposals the company made for the Malts Avenue closing, none of those include terminating the contract while employees are still working at the plant. They all include terminating the contract after the plant closes or there are no employees working, whichever occurs later. And so where does that lead you? Which is it leads you to the conclusion that that – because the union's position, at least at some points, was that there shouldn't be a termination. So maybe the union was – if you think this binds the union, which I'm not at all sure why it does, then maybe the union was also bargaining inconsistently with the framework. Where does that get you with regard to the Borg-Warner-related question? Only that neither party could insist on a permissive subject of bargaining. The union had every right not to negotiate about early termination of the contract. It could voluntarily negotiate it if it wanted to. So essentially what you're saying is that the union, by saying it doesn't terminate, really was just not bargaining so it doesn't have the problem. In other words, the status quo was there's a contract and they're saying – and they're just saying leave us alone. We're not going to change that. And they were entitled to do that. I believe the union in this case is entitled to do it. If there were a re-opener position, a re-opener provision, then that might be different. But the company never offered the union what was actually in the San Jose framework, which is midterm cancellation while – after the employees have been laid off. If they had – The board specifically, I said, characterized the board as having relied on that. But did they clearly say that? I believe the board did. The framework argument, they mentioned the San Jose contract and the fact that it had the provision that said whichever came earlier, closure or the last person standing. But they didn't invoke that locution when they – because they kept it pretty general, actually, when they said why it wasn't directly in keeping with the San Jose. On the board's side. On the board's side. Well, the board discussed it in the section of its decision where it talks about the waiver argument because the company before the board had argued that the union had agreed to the San Jose framework, so it was waiving any argument it had that it didn't have to comply with that. So the board addressed it in that section by talking about the fact that there couldn't have been – there was no clear and unmistakable waiver, but also that the two parties seemed to disagree about what the San Jose framework contained. But the board's, as I think you termed it, general description of the permissive subject of bargaining is because you're right, Your Honor. There are very few cases where this comes up. It is rare. I mean, the board said in Seabay Manor, where it found that the company could tie a permissive and a mandatory subject together, that those cases – Got the interest arbitration case. Exactly. But that was all post. That wasn't about bargaining. That was where the – you were right. It's where the parties decided they couldn't agree, so they tied it up in an interest in an arbitration case. And so the question was really the repudiation of something you'd already voluntarily agreed to. And the board's point there was that these are functionally the terms and conditions of employment, because this is how they're going to exist in this case. Right. So each of the cases has a little – A twist. Yes. And none of them – I mean, and if you take them and start broadening them out, you've eliminated the whole permissive subject-forewarner principle. I mean, I don't understand why it doesn't at that point go up in smoke unless you regard it as a very narrow notion in very particular circumstances. So I can't really tell whether the board's ruling here is that the whole concept doesn't apply to this situation or that they didn't wrap it up properly with regard to what the San Jose framework was. And if there had been – if they really had been following the San Jose framework, then these – then there wouldn't have been a problem. Well, I think the board is, first of all, saying – reiterating Borgwarner – you cannot insist on a permissive subject. Why don't you just stop there? I will ask them next time. But if you're going to say that you can, you have to show something more. You have to show that this is so important to your mandatory subject, the two have to be bargained together. I mean, as I understand the Nordstrom case, I think it's the Nordstrom case. One of the cases says, well, sure, if they won't agree to a nonmandatory subject, then you can change your position on the mandatory subject, because so they could have said, all right, we're not – we're going to give less severance than we would have otherwise. They could have done that. Right? And that seems to me the position that's consistent with the Borgwarner principle. Yes. But then to start saying you can actually insist on the nonmandatory subject, I don't understand. Even conceptually, I don't understand. I don't think I can help you, because I don't really understand either. I mean, the board just reiterated you cannot insist. You would have to show more. There are so few cases, I'm not sure the board is exactly clear on what exactly you would have to show. Seabay Manor, as you said, is very different. The only two other cases are Borden and Regal Cinema, which were about severance and releases. In Borden, the board said a general release of all claims against the company is not sufficiently tied to severance. In Regal Cinemas, the general release, the release was not general. It was very specific. You're just giving up your right to claims related to your termination, and the board said you could tie those things together. But other than that, there's not a lot of guidance, because it just does not happen very often. And I don't think the board, the board certainly does not want to put limits on Borgwarner. Permissive subjects of bargaining are permissive. It's 8D of the Act. You can't insist on permissive subjects of bargaining. Do you have any elimination, just because I'm curious about what was really going on here? I have a theory. I mean, I wasn't involved in the hearing. The company initially said it would close in November of 2008. Then it said it would close in October of 2009. Then it said it would keep the warehouse part open indefinitely. I think they wanted to keep the plant open at least for a while and get rid of the union. I mean, that seems the most logical. I mean, they haven't told me. I'm speculating. But from the record, that seems the most logical. If they wanted, if recall rights were really the issue, they could have asked the union for a waiver of recall rights. But as far as I can tell, that was not a request. And to some degree, they did with the seniority waiver. With the seniority waiver, right. But, okay. Anything else? Not unless you have any questions for me. But I would like to reserve some time for the union who's here to speak. Oh, okay. Thank you. Don't get paid if you don't argue. You didn't file a brief, so I didn't think you were going to argue. May it please the Court. Michelle Rebar on behalf of the union Teamsters District Council No. 2, Local 388. I don't think I have much to add, because I think that the parties have already gone over a lot of the issues, but we know the main issue is whether early contract termination became a mandatory subject of bargaining. And, you know, our contention is that it did not. And the Petitioner's main argument is that there's a sufficient nexus because the parties agreed in the collective bargaining agreement to use the San Jose framework and plant closings. Did the parties agree? I'm sorry? Did the parties agree? No. I mean, our position is that, you know, the board was correct, because nothing in the collective bargaining agreement actually indicated that the union was bound to negotiate early contract termination and future plant closings. And you've already referenced that on ER 80, where the provision that the company refers to, it says it is the company's intent and future plant closures, if any, to bargain a severance impact formula that is not inconsistent with the severance impact bargaining formula agreements at San Jose. It says nothing about early contract termination or the unions, you know, being bound to negotiate that. As far as the San Jose framework and the company's argument regarding that, as you've already noted, the parties had critically different understandings as to what that entailed, and the board made that finding. And to the union, it meant basically what was what happened at San Jose, termination of the contract after there were no more employees or the plant closed, whichever becomes later. And the differences in understanding is critical, because if you're terminating the contract while employees remain at the plant, you're basically waiving bargaining rights for all these employees. So the union, from the union's perspective, it could have been breaching its duty of fair representation, or at least that's what was the perspective of the people involved. And also there's the possibility that the company's going to whittle down its operations, keep a couple people employed, keep the plant operating, and then rehire everybody as a nonunion. This is a possibility in this case, versus termination after all the employees are laid off and the plant closes. This isn't so much a possibility. Because of this, the Parsi parties never had a mutual understanding as to what the San Jose framework entailed, and this has basically, unlike all the cases, unlike the Seabay Manor case, where the parties had a specific agreement for interest arbitration, even though that case is a lot different than this case. I think the Petitioner's argument about this agreement was that there were no more than two ways to prevail.   And I think that's the basic notion that there is a category of cases in which the permissive bargaining prohibition on bargaining to impasse doesn't apply. Are you challenging that? Not really. No. I mean, we agree with the Board's decision here. We're just saying that. No. I'm not asking you that. I'm asking you whether, I mean, there would be two ways to prevail. One would be that the distinctions the Board makes of the other cases are valid, and the other one is those other cases are wrong anyway. Right. I mean, I just think this case is very different from those cases. But if you do compare this case to those cases, for example, the Seabay Manor case, there the parties had a specific agreement for interest arbitration. They had voluntarily agreed to that, whereas here there isn't an actual agreement in writing that says that the union's going to agree to, you know, an early contract termination proposal. The language just isn't there. You know, I think the Petitioner's argument is almost a waiver argument, that the union, you know, waived its right to bargain. Well, that's how the Board treated it. Right. And I think that's almost what the argument is, although they're couching it as this nexus argument. But they're mostly saying that, you know, there was a, you know, basically the union waived its right. And we know that waivers of statutory rights have to be clear and unmistakable. And as the Board found, there's no evidence of a clear and unmistakable waiver here. The language isn't there in the contract. So we would just ask that the Court affirm the decision. Thank you both. Thank you. I'll give you a minute of rebuttal. Do you think there's a remedy issue? No. I mean, you know, that's a good question. I think that's between the Board and the company. Okay. Thank you. Well, I hope somebody will illuminate us in writing about that question so we know what we're doing. Yes, sir. And we will, Your Honor. Thank you. I just wanted to comment on one thing. I think the essence of these cases is the relationship between the parties. The essence of these cases is what is discussed at negotiations, so that the parties Which negotiations? In general, Your Honor. I mean, if you look at the specifics in all of these cases. So you're not talking about the supposed prior agreement. You're talking about this round of negotiations. Well, no, I'm talking about the prior agreement as well. I'm trying to find out. No, but in these cases, the Board always looks at what's said at negotiations, what's agreed to, so that the parties know what they can rely on, as they wanted to know here, so that this is not a guessing game. So coming back to the waiver discussion, which frames it a little more clearly than the nexus in the Board's opinion, they did look at it, and they said, you guys are miles apart on what this framework is. And if that's the case, why isn't their determination defensible then? Well, I think the Board ignores the evidence in this case. Well, what? Excuse me, Your Honor. What? I think the Board ignores the years of bargaining history in this case, which is critical. Well, get involved in labor negotiations, and believe me, maybe it's this unique industry where there's such a long history, and maybe there are all of these off-the-record or sidebar understandings. But when you say that the parties are supposed to understand their relationship, there still comes back to the fundamental aspect that you have a written agreement. You reduce it to writing. And if the writing is unclear, then I'm not sure where certainly we as a court of, you know, superficiality, if you will, when it comes down to what the histories are. That's the Board's role. I mean, we've been trying to puzzle out the logic of your position and the logic of their position. It's very difficult, I have to say, in this case to figure out when you say there's a framework and you say the union agreed to that, and then I go back and I look at your site, and it cites the CBA. And then so then I try to find out, well, where did they agree to negotiate an early termination of the CBA that was broader than what was put in writing in the San Jose Agreement? It seemed to me the evidence of the relationship and the understanding would be defined by the document that they incorporated by reference. And that does say, you know, closure or no more employees. The document that's incorporated by reference, absolutely, but also the bargaining history between the parties. I mean, what's actually said at the bargaining table? And I think there was an understanding, certainly in the San Jose closing, and then there was an understanding in 2004 that was then ---- That what? Is that documented or that's just conflicting statements? I think that's documented between the San Jose Closing Agreement and Section 30. What is documented? I'm sorry? What? What is documented? What that closing framework was going to be. And it's going to be whatever you say? I don't understand. That the parties committed to talk about those four points, which is something that's a little bit necessarily beyond effects bargaining. It's providing a framework that really isn't set out in the law. And what occurred, though, is in Fresno, the union essentially reneged on that agreement. The union said that they didn't want to terminate the contract at all. And people have raised ---- But they had no statutory obligation to bargain about terminating the contract, right? So when they say they don't want to terminate it, they're just saying we're not going to talk about it because they didn't have to talk about it. Well, except that they had already agreed to talk about it. All right. They had already agreed to talk about it, only in a closing. And there was some suggestion of animus, of union animus, that they wanted to ---- I mean, this company has thousands of employees under contract. They were dealing with this particular issue in Fresno. They also had business difficulties following this. This was a very mature industry, and they had to take the plants one at a time. They were all different. They were different sizes. They had different products. They had different employee complements. That's why they handled it this way. Thank you. Thank you very much. Thank you to both parties. The case of Rockton Services v. NLRB is submitted, and we are in recess. Thank you.
judges: ALARCON, FISHER, BERZON